UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                                                                        :

JACK RUSSELL MUSIC LTD.,                                        :

                  Plaintiff/Counter-Defendant,         :

                                                            :

                         -v-                                              :                        23-CV-4906 (JMF)

21ST HAPILOS DIGITAL DISTRIBUTION, INC. et al., :                OPINION AND ORDER

                  Defendants/Counter-Claimants,  :

                         -v-                                              :

NW ROYALTY CONSULTING LLC et al.,        :

                  Counter-Defendants.                :

-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

At its heart, this case is a dispute between Plaintiff Jack Russell Music Ltd. ("JRML"), a music publishing company based in the United Kingdom, and Defendants 21st Hapilos Digital Distribution, Inc. and Hapilos Publishing LLC (together, "Hapilos"), music distribution and publishing companies based in New York. In its principal Complaint, JRML alleges that Hapilos tortiously interfered in JRML's business by poaching music writers who had contractual relationships with JRML. See ECF No. 1 ("Compl.").[1] In its Amended Answer and Counterclaims against JRML and NW Royalty Consulting LLC ("NWRC"), a Delaware-based affiliate of JRML, Hapilos denies these claims and alleges that, in fact, it was JRML and NWRC that tortiously interfered in Hapilos's business by poaching music writers who had contractual relationships with it. See ECF No. 35 ("Am. Answer"), ¶¶ 102-09.

---

[1]     The Complaint originally named Hapilos Entertainment Group, Inc. See Compl. at 1. By stipulation, it was replaced with Hapilos Publishing LLC. See ECF No. 30.

More relevant here, Hapilos also brings three claims of libel based on four sets of emails:

- **The "Parkinson emails"** between Clare Ram, an employee of JRML, and a representative of the Performing Rights Society for Music ("PRS"), a performing rights organization ("PRO"), on which Hapilos was copied. In an email dated December 22, 2022, Ram represented to PRS that Dwayne Ryan Parkinson, a contested client between JRML and Hapilos, "never signed a deal with Hapilos" and that "[JRML's] agreement pre-dates the Hapilos agreement and our writer has not terminated his agreement." *Id.* ¶ 116; *see also id.* Ex. 2. Ram advised PRS to "not accept [Hapilos's] claim and maintain [JRML's] claim" as to "all Mr. Parkinson's works." *Id.* ¶ 116. Hapilos alleges that Parkinson in fact signed a contract with Hapilos in December 2018. *Id.* ¶ 117.

- **The "Shakespeare emails"** between Louise Cook, a JRML representative, and Brandon Samuel Shakespeare, a Hapilos client. In an email dated September 13, 2022, Cook wrote Shakespeare: "As you may or may not know, we are having issues with Hapilos registering the publishing to themselves for the songs that they are releasing." *Id.* ¶ 123; *see also id.* Ex. 4. After discussing two of Shakespeare's works as examples, Cook proceeded to advise Shakespeare: "Please be aware that this can happen for any songs released through Hapilos. They have also been found to be claiming on the masters so be very careful who you distribute with." *Id.* ¶ 123. Two days later, Cook followed up on the same email chain to inform Shakespeare that JRML "will work to get the [] registrations amended" and that its "issue lies solely with Hapilos, as they are the ones who keep making incorrect registrations." *Id.* ¶ 126. Geri Richardson, an NWRC representative, then forwarded the email chain to a representative of Broadcast Music Inc. ("BMI"), a PRO with which Hapilos maintains an agreement. *Id.* ¶ 124.

- **The "Whittaker emails"** between Geri Richardson, the NWRC representative, and Madison Fields, a BMI representative. In an email dated March 31, 2022, Richardson wrote Fields:

  > None of our writers have terminated their agreements yet Hapilos keeps registering titles for our writers that are under our agreements and not just with NW Collections but with just about every other publisher out there, at least in the reggae genre.
  >
  > They don't register the titles with the correct information. They constantly leave off writers and in many instances don't give credit to the artist.
  >
  > I don't understand why Hapilos doesn't have to provide a letter of termination from each writer that they claim to have a publishing agreement for? Hiding a publishing clause on page 7 of a distribution agreement doesn't constitute a valid publishing agreement.

*Id.* ¶ 132; *see also id.* Ex 5. Hapilos alleges that these statements imply that Hapilos was engaging in fraudulent behavior and that it was "dishonest with its own Clients by attempting to 'hide' contract language from them," even though Hapilos "engages in none of this behavior." *Id.* ¶ 133.

2

- **The "Chronic Law emails"** between Ram of JRML and Akeem Cummings, JRML's and NWRC's client.  In an email dated March 27, 2023, Ram advised Cummings that JRML "will add to [its] claim against Hapilos" with respect to several songs, and added: "We also note that Chronic Law [a recording artist] is not signed to Hapilos." *Id.* ¶ 135; *see also id.* Ex. 6.  On September 25, 2023, Richardson forwarded the entire email chain to BMI.  *Id.* ¶ 136.  Hapilos alleges that "Chronic Law did indeed sign a contract with [Hapilos] on April 14, 2020" and that both Ram and Richardson were aware of that contract.  *Id.* ¶ 137.

As pleaded in its Amended Answer, Hapilos brings a counterclaim for violation of the United Kingdom's Defamation Act of 2013 based on the Parkinson emails, *see id.* ¶¶ 169-76 (Counterclaim V), and claims for libel and trade libel under Delaware law based on the Shakespeare emails, the Whittaker emails, and the Chronic Law emails, *see id.* ¶¶ 177-85 (Counterclaim VI), ¶¶ 186-91 (Counterclaim VII).  JRML and NWRC now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss these counterclaims.  *See* ECF No. 39 ("Countercl.-Defs.' Mem.").  They do not move to dismiss Hapilos's counterclaims regarding tortious interference (Counterclaims I through IV).  *See* Am. Answer ¶¶ 139-68.

## DISCUSSION

In deciding a Rule 12(b)(6) motion to dismiss counterclaims, a court must accept all well-pleaded facts alleged in the counterclaims as true and draw all reasonable inferences in the non-moving party's favor.  *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).  To survive a motion to dismiss, a counterclaim must include "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  A claim is plausible on its face when the complainant has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  The complainant must nudge its claims across the line "from conceivable to plausible." *Twombly*, 550 U.S. at 570.  In other words, to state a valid counterclaim, a complainant must show more

than a "sheer possibility" that the counterclaim-defendant acted unlawfully and cannot rely on mere "labels and conclusions." *Id.* at 555.

### A. Libel (Counterclaims V and VI)

Hapilos's libel counterclaims — that is, Counterclaims V and VI — fail to clear the plausibility threshold. That is true whether New York law, United Kingdom law, or Delaware law applies — an issue on which the parties spill most of their ink.[2] *See, e.g.*, *Fin. One Publ'g Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (noting that, under New York law, courts do "not have occasion to embark on a choice-of-law analysis in the absence of an 'actual conflict' between the applicable rules of two relevant jurisdictions"). That is because, under the law of all three of these jurisdictions, Hapilos must show that the emails at issue were "defamatory," which is a legal question to be resolved by the court in the first instance. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (New York law); *Page v. Oath Inc.* 270 A.3d 833, 842 (Del. 2022) (Delaware law); *Monroe v. Hopkins* [2017] EWHC 433, ¶ 23 (QB) (United Kingdom law). Further, the meaning of the term "defamatory" is materially identical in all three jurisdictions, namely "tend[ing] to expose a person to public

---

[2] Contrary to JRML's and NWRC's presumption that Counterclaim VI was brought "under New York law," Countercl.-Defs.' Mem 4, Hapilos brought its libel and trade libel counterclaims "under the laws of the United Kingdom and Delaware" only, Am. Answer ¶ 111. The Court could therefore analyze (and, if appropriate, dismiss) Counterclaim V solely under United Kingdom law and Counterclaims VI and VII solely under Delaware law. But it makes sense to fold New York law into the analysis from the get-go for two reasons. First, the Court is skeptical that United Kingdom law or Delaware law governs the counterclaims at issue, substantially for the reasons discussed in JRML's memoranda of law. *See* Countercl.-Defs.' Mem. 10-13; ECF No. 44 ("Countercl.-Defs.' Reply"), at 1-3. Second, should the Court conclude (as it does) that Hapilos fails to plead elements common to New York, United Kingdom, and Delaware law, it would follow that granting Hapilos leave to replead under New York law would be futile. *See, e.g.*, *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (holding that a district court may dismiss without granting leave to amend where repleading would be "futile"); *cf., e.g.*, *Coscarelli v. ESquared Hospitality LLC*, 364 F. Supp. 3d 207, 221 (S.D.N.Y. 2019) (dismissing claims under California law and granting leave to replead under New York law).

4

contempt, hatred, ridicule, aversion or disgrace." *Davis v. Boeheim*, 24 N.Y.3d 262, 268 (2014); *Cousins v. Goodier*, 283 A.3d 1140, 1148 (Del. 2022) ("A statement is defamatory when it 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'"); *Corbyn v. Millett* [2021] EWCA 567, ¶ 9 (20 April 2021) ("To be defamatory, the imputation must be one that would tend to have a 'substantially adverse effect' on the way that people would treat the claimant.").

Measured against these standards, Hapilos's libel counterclaims fall short.[3] That is plainly true insofar as Counterclaims V and VI are based on the Parkinson emails and the Chronic Law emails. In both sets of emails, Ram simply advised the corresponding PRO that the client at issue was not signed to Hapilos. *See* Am. Answer Ex. 2; *id.* Ex. 6. Putting aside the matter of whether Parkinson and Chronic Law were, in fact, signed to Hapilos, such statements are not "defamatory" by the standards of New York, Delaware, or United Kingdom law as they merely "reflect[] JRML's factual and legal position in an inter-business dispute." Countercl.-Defs.' Mem 16. An examination of the content of the communications as a whole, as well as their "tone and . . . apparent purpose," *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 293 (1986); *accord Agar v. Judy*, 151 A.3d 456, 481 (Del. Ch. 2017); *Corbyn v. Millett* [2021] EWCA 567, ¶ 23, confirms that Ram, as JRML's representative, made these statements to protect JRML's

---

[3]  In reviewing a motion to dismiss, "a court may consider only: (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit." *Frommer v. MoneyLion Techs., Inc.*, No. 23-CV-6339 (JMF), 2024 WL 2158589, at *6 (S.D.N.Y. May 14, 2024) (quoting *Ratermann v. Pierre Fabre USA, Inc.*, No. 22-CV-325 (JMF), 2023 WL 7627425, at *1 n.2 (S.D.N.Y. Nov. 14, 2023)). In disregard of this well-established rule, JRML and NWRC refer to "written evidence" purporting to show that Parkinson "did not have a contract with [Hapilos]" and information about conventions in "the United States music industry" in their opening brief. Countercl.-Defs.' Mem. 14 n.11, 17 n.15; *see* ECF No. 41 ("Hapilos Opp'n"), at 1-2. The Court does not consider any of these references.

interests against what was perceived (rightly or wrongly) to be encroachment by Hapilos. *See* Am. Answer Ex. 2, at 1 (Ram asserting that "Parkinson has never signed a deal with Hapilos" in response to a copyright analyst's notification that Hapilos's general agreement registration as to Parkinson "is conflicting with the current claimant in [JRML's] system"); *id.* Ex. 6, at 2-3 (Ram proactively noting that "Chronic Law is not signed to Hapilos" in response to a client flagging to her that Hapilos "[i]s claiming my song Garrison," for which Chronic Law is the artist). The fact that JRML and/or NWRC made Hapilos itself privy to both sets of emails (whether by including Hapilos in the original list of recipients or forwarding to Hapilos) provides further contextual support for the conclusion that Ram's statements were not defamatory but merely statements made with respect to routine business disputes. *See id.* Ex. 2, at 1; *id.* Ex. 6, at 1.[4]

The counterclaims premised on the Shakespeare and Whittaker emails present a closer question, but they ultimately fall short as well. To be sure, both emails contain broad statements that suggest flaws across all of Hapilos's registrations, and they are therefore arguably "deprecating" and "hostile" to Hapilos. *Mirza v. Amar*, 513 F. Supp. 3d 292, 299 (E.D.N.Y. 2021). But that is not enough. "[L]oose, figurative or hyperbolic statement[s]" whose contexts "adequately signal[] to readers that [they are] just defendant's opinion[s] as a disgruntled customer" or business competitor are "not generally actionable." *Id.* (quoting *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999)); *see also Riley v. Moyed*, 529 A.2d 248, 253 n.5

---

[4] Because the Parkinson emails do not contain a defamatory statement, the Court need not resolve the parties' dispute regarding the significance of Hapilos's allegation — introduced only in response to JRML's and NWRC's initial motion to dismiss — that Ram's statements in these caused PRS to "impose[] an 'ongoing ban on Hapilos registrations'" in July 2023. Am. Answer ¶¶ 119-20. That said, the Court agrees with JRML and NWRC that Hapilos fails to make any non-conclusory allegations describing or suggesting a link between the Parkinson emails and any PRS ban, *see* Countercl.-Defs.' Mem. 14-15, and therefore fails to establish "serious harm" under United Kingdom law, *Monroe v. Hopkins* [2017] EWHC 433 (QB), or "special damages" under New York law, *Palin*, 940 F.3d at 809.

6

(Del. 1987) ("[W]here potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their position by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." (quoting *Okun v. Sup. Ct.*, 29 Cal.3d 442, 450-51 (1981)); *Steinhilber*, 68 N.Y.2d at 294 (similar). Richardson's statements in the Whittaker emails were made in precisely such a context: a heated business dispute. Leading up to the relevant statements, Richardson asked the BMI representative in palpable frustration, "What exactly are you looking for? The agreements are attached. None of our writers have terminated their agreements yet Hapilos keeps registering titles for our writers that are under our agreements." Am. Answer Ex. 5, at 1. Only then did she fire off the statements at issue, plainly in an effort to "persuade [BMI] to [NWRC's] position" with regard to the contested clients and undermine Hapilos's claims to the same. *Riley*, 529 A.2d at 253 n.5. This context also "adequately signals to readers that" her use of the word "hiding" to describe Hapilos's placement of the publishing clause in a distribution agreement reflects "just [her] opinion as a disgruntled" party to an ongoing business dispute. *Mirza*, 513 F. Supp. 3d at 299; *see also Owens v. Lead Stories, LLC*, No. S20C-10-016 (CAK), 2021 WL 3076686, at *15 (Del. Sup. Ct. July 20, 2021) ("[R]eaders would have understand 'Hoax Alert' as a rhetorical hyperbole implying that the Owens' Post carries inaccurate information and that [they] should proceed cautiously when reading the post."); *cf. Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 415 (1st Dep't 2011) ("The culture of Internet communications, as distinct from that of print media such a[s] newspapers and magazines, has been characterized as encouraging a freewheeling, anything-goes writing style." (internal quotation marks omitted)).

The same goes for Cook's statements in the Shakespeare emails. Even if her statements may not have crossed the line into "hyperbole," they were certainly loose; the broader context of the email chain makes plain to any reasonable recipient that Cook was writing out of frustration on account of JRML's "issues with" interfering Hapilos registrations. Am. Answer Ex. 4, at 2. Indeed, Cook made the relevant statement in the Shakespeare emails while forwarding to Shakespeare an internal email in which Richardson informed JRML's "Admin" email account that Hapilos incorrectly registered two of Shakespeare's songs and complained, "I am so sick of these idiots! UGH!!" *Id.* at 3. And here, too, the fact that NWRC invited BMI to "reach out to Hapilos" — which BMI eventually did by forwarding the entire email chain — provides further contextual support for the conclusion that Cook's statements were made solely to support JRML's and NWRC's positions in an ongoing business dispute. *See id.* at 1.

In sum, Hapilos's libel counterclaims (Counterclaims V and VI) must be and are dismissed for failure to state a claim, whether under New York law or the laws of the jurisdiction under which those counterclaims were raised.

**B. Trade Libel (Counterclaim VII)**

That leaves only Hapilos's trade libel counterclaim (Counterclaim VII). Here, the choice of law does appear to matter. Under New York law, Hapilos's trade libel counterclaim would fall with its libel counterclaims. *See Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (summary order); *see also Jain v. Sec. Indus. & Fin. Mkts. Ass'n*, No. 08-CV-6463 (DAB), 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009) ("New York law considers claims sounding in tort to be defamation claims . . . where those causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by plaintiff flows from the effect on his reputation." (cleaned up)). By contrast, if Delaware law (the law under which

Hapilos pleads its trade libel counterclaim) applies, the claim might well survive.  Relevant authority under Delaware law is thin, but it suggests that a statement may not need to be "derogatory" to support a claim of trade libel and, accordingly, that libel and trade libel claims based on the same set of facts may not be duplicative.  *See, e.g.*, *In re Nat'l Collegiate Student Loan Trs. Litig.*, No. 12111-VCS, 2020 WL 3960334, at *4-5 (Del. Ch. July 13, 2020).  If that is correct, all that Delaware law would require is that the maker of the statement intended for "publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognize[d] or should [have] recognize[d] that it [was] likely to do so," and that she knew "that the statement [was] false or act[ed] in reckless disregard of its truth or falsity." *CapStack Nashville 3 LLC v. MACC Venture Partners*, No. 2018-0552-SG, 2018 WL 3949274, at *6 (Del. Ch. Aug. 16, 2018).  If so, then Hapilos's trade libel counterclaim might survive under Delaware law but fail under New York law.  *See, e.g.*, Am. Answer ¶ 130-31 (alleging that Cook's admonitions to Shakespeare "caused [] Shakespeare to breach his current contract with Hapilos" and caused Hapilos to lose "approximately $3,200 per month").

Ultimately, however, the Court need not pin down the Delaware law of trade libel because New York law plainly applies to the counterclaim substantially for the reasons explained in JRML's and NWRC's memoranda of law.  *See* Countercl.-Def.'s Mem. 10-13; Countercl.-Def.'s Reply 1-3.  In tort actions such as this one, New York applies the law of the state with the "most significant interest in the litigation." *Broadspring, Inc. v. Congoo, LLC*, No. 13-CV-1866 (JMF), 2014 WL 4100615, at *6 (S.D.N.Y. Aug. 20, 2014) (quoting *Lee v. Bankers Tr. Co.,* 166 F.3d 540, 545 (2d Cir. 1999)).  In the libel context, "the state of most significant relationship is usually the state where the plaintiff was domiciled at the time, if the libel was published in that state, since that is where he is presumed to have been most injured." *Davis v. Costa-Gavras*, 580

9

F. Supp. 1082, 1091 (S.D.N.Y. 1984).  Where it is "not immediately apparent how one might identify 'the place' where the tort of defamation occurred, . . . there is a presumptive rule that the law of the plaintiff's domicile applies." *Broadspring*, 2014 WL 4100615, at *6.  Here, the only link between Delaware and the relevant statements is that NWRC, Richardson's employer, is a citizen of that state.  Even assuming that Richardson's statements were "published in" Delaware, it is plain that Delaware is not the state with the "most significant interest" in this case because (1) Richardson's statements only account for one of the three sets of emails on which Hapilos's trade libel claim is based; (2) the parties agree that Hapilos itself was domiciled in New York at the time of the relevant statements, *see* Compl. ¶ 12; Am. Answer ¶ 86; and (3) Hapilos's core complaint is that its royalty collections, which presumably occur at its principal place of business in New York, were negatively impacted.  At the very least, therefore, the "presumptive rule" favoring the law of Hapilos's domicile — New York — applies.  *Broadspring*, 2014 WL 4100615, at *6.  It follows that Hapilos's trade libel counterclaim must be and is dismissed for the same reason as its libel counterclaims.  *See Hengjun Chao*, 476 F. App'x at 895.

*          *          *          *

In the final analysis, the emails upon which Hapilos bases its counterclaims are, at most, "fiery rhetoric" used to "persuade" the relevant PROs to JRML's and NWRC's positions with respect to contested clients in the context of a heated business dispute with Hapilos.  *Riley*, 529 A.2d at 253 n.5; *see also Steinhilber*, 68 N.Y.2d at 294.  "The constitutional guaranty of freedom of speech and press . . . has for its only limitations the law of slander and libel," and these narrow limitations "do[] not undertake to relieve from *all* the annoyances caused by those who are inconsiderate of the feelings and business interests of others."  *Marlin Fire Arms Co. v. Shields*, 171 N.Y. 384, 389, 391 (1902); *see also Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 156 (1993)

(emphasizing the need to "avoid the hypertechnical parsing of written and spoken words for the purpose of identifying possible facts that might form the basis of a sustainable libel action" (cleaned up)).  The trade libel exception to free speech is similarly narrow, inspired by the concern that "free speech could be used as a bludgeon to destroy competition without effective redress at law."  *CapStack Nashville 3 LLC*, 2018 WL 3949274, at *6.  To hold that JRML's and NWRC's statements made in the course of a business dispute fit into that narrow category would be to let "[t]he exception . . . swallow[] the rule."  *Id.*

## CONCLUSION

Accordingly, and for the reasons stated above, the Counterclaim-Defendants' motion to dismiss is GRANTED, and Counterclaims V, VI, and VII are dismissed.  Further, because the problems with these Counterclaims are substantive and cannot be cured (even if repleaded under New York law), the Court denies leave to replead.  *Cuoco*, 222 F.3d at 112.  Unless and until the Court orders otherwise, Counterclaim-Defendants shall answer Hapilos's other counterclaims **within two weeks of the date of this Opinion and Order**.  *See* Fed. R. Civ. P. 12(a)(4)(A).

The parties are reminded that, per the Case Management Plan and Scheduling Order ("CMP"), ECF No. 27, counsel should submit their joint status letter on ECF no later than the Thursday prior to the July 3, 2024 pretrial conference (i.e., **tomorrow**).  The letter should address, in addition to the issues set forth in the CMP, whether the parties can do without a conference altogether.  Unless and until the Court orders otherwise, all existing dates and deadlines — including, as appropriate, the deadlines for summary judgment motions and/or a proposed joint pretrial order, as set forth in the CMP — remain in effect.

If, after reviewing the parties' joint status letter, the Court concludes that a conference is unnecessary at this time, it will issue an order canceling or rescheduling it.  If a conference is

held, **it will be by telephone** and may be scheduled for a different time.  To that end, counsel should indicate in their joint status letter dates and times during the week of the currently scheduled conference **and the week of July 15, 2024**, that they would be available for a telephone conference.  Unless and until the Court orders otherwise, however, the conference will proceed — and will do so on the date and time previously set.

In the event a conference is held, the parties should join it by calling the Court's dedicated conference line at (888) 363-4749 and using access code 542-1540, followed by the pound (#) key.  Further, counsel should review and comply with the procedures for telephone conferences set forth in the Court's Individual Rules and Practices for Civil Cases, available at https://nysd.uscourts.gov/hon-jesse-m-furman, including Rule 3(B)(i), which requires the parties, **no later than 24 hours before the conference**, to send a joint email to the Court with the names and honorifics (e.g., Mr., Ms., Dr., etc.) of counsel who may speak during the teleconference and the telephone numbers from which counsel expect to join the call.

The Clerk of Court is directed to terminate ECF No. 38.

SO ORDERED.

Dated: June 26, 2024
New York, New York

JESSE M. FURMAN
United States District Judge